# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:18-cv-309-FDW

| | |
|---|---|
| J'BARRE HOPE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| REHABILITATIVE DIVERSION UNIT, ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the Court on initial review of Plaintiff's Complaint, (Doc. No. 1), and on Plaintiff's Emergency Motion for Injunctive Relief, (Doc. No. 10), to which the Office of the Attorney General of North Carolina has filed a Response to an Order to show cause why relief should not be granted. (Doc. Nos. 13, 14). Plaintiff has also filed a Motion to Disqualify the North Carolina Office of the Attorney General, (Doc. No. 14), a Motion to Appoint Counsel, (Doc. No. 16), a Motion for Default Judgment, (Doc. No. 17), a Motion for Appropriate Relief, (Doc. No. 18), and a Motion for No-Response Default Judgment, (Doc. No. 19). Plaintiff is proceeding *in forma pauperis*. (Doc. No. 13).

## I. BACKGROUND

The *pro se* incarcerated Plaintiff filed a civil rights suit pursuant to 42 U.S.C. § 1983 addressing the conditions of confinement he is allegedly experiencing at the Marion Correctional Institution's Rehabilitative Diversion Unit ("RDU") Program. He names as the sole Defendant the "Rehabilitative Diversion Unit of Marion Correctional." (Doc. No. 1 at 1).

Construing the Complaint liberally and accepting the allegations as true, Plaintiff was admitted to Marion C.I.'s RDU on January 9, 2018. At that time he had three standard transfer

1

bags of property however, the "R.D.U. of MC turnkeys" seized the property and gave Plaintiff the choice between either donating the property or having it destroyed. (Doc. No. 1 at 2). Plaintiff rejected this "ultimatum" and his properly was disposed of. (Id.). The property included books, periodicals, tennis shoes, smart watch, religious headgear, hygiene items, a razor.

Plaintiff was then placed in indefinite solitary confinement where he had been housed for 274 consecutive days at the time he filed the Complaint. Prolonged solitary confinement causes serious mental illness. On October 15, 2018, after more than nine months in solitary confinement, he was diagnosed with "Abnormal Weight Loss associated with Heightened Anxiety and Antisocial Personality Disorder," and has lost more than 50 pounds associated with the mental illness. (Doc. No. 1 at 2).

In a "Declaration of Truths" filed with the Complaint, (Doc. No. 1 at 6), Plaintiff states that he is locked in a 6' by 9' sleeping cubicle with a toilet, mattress, and less than two cubic feet of personal property where he is locked at least 23 hours per day. He is allowed to leave in handcuffs three times per week for a 15-minute shower and four times per week for one hour of recreation in a designated recreation cubicle.

As relief, Plaintiff asks to recover his items of personal property, $250,000 in compensatory damages, and $60,000 in punitive damages.

## II. MOTION FOR PRELIMINARY INJUNCTION

**(1) Legal Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). A preliminary injunction is a remedy that is "granted only sparingly and in limited circumstances." MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (quoting

Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991)).

To obtain a preliminary injunction, a movant must demonstrate: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. DiBiase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (quoting Winter, 555 U.S. at 20).

The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. See Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013). It is well established that "absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities." Taylor v. Freeman, 34 F.3d 266, 268 (4th Cir. 1994); see Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982) ("judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.").

**(2)** **Plaintiff's Motion**

Plaintiff filed an Emergency Motion for Injunctive Relief, (Doc. No. 10), in which he seeks relief from continuous solitary confinement that had lasted, at the point the Motion was filed, for more than 12 months. He alleges that he has been diagnosed with heightened anxiety and antisocial personality disorder while confined in continuous solitary confinement and is suffering from abnormal weight loss due and malnutrition has resulted from the solitary confinement. He seeks unconditional release from solitary confinement, a 3,000-calorie diet and protein snack for 12 months, and transfer to "Facility 4870." (Doc. No. 10 at 2).

Plaintiff attached to his Motion a Nutritional Assessment Form completed by Registered Dietician Mickie Herman on October 11, 2018. (Doc. No. 10-1). The form indicates that Plaintiff

has lost "50+ LBS IN THE LAST YEAR" and that he is diagnosed with "ABNORMAL WEIGHT LOSS, HTN, ANXIETY, ANTISOCIAL PERSONALITY D/O." (Doc. No. 10-1 at 1). The form's "Recommendations" section states that, for the next six months, Plaintiff should receive regular non-meat diet with snacks, "ADVISE PT TO CONSUME ALL MEALS AND SNACKS. ENCOURAGE DIET COMPLIANCE … MONITOR WEIGHT AND LABS PER MEDICAL POLICY; CONSULT RD WITH ANY SIGNIFICANT CHANGES." (Id.).

**(3)** **Attorney General's Response**

The Court ordered the Office of the Attorney General to show cause why injunctive relief should not be granted. (Doc. No. 11).

The Attorney General filed a Response, (Doc. No. 15), arguing that emergency injunctive relief should not be granted because Plaintiff has failed to satisfy the elements of an Eighth Amendment claim and thus is not likely to succeed on the merits, the conditions of which Plaintiff complains are due to his own actions, he has failed to demonstrate irreparable harm, and granting relief is not in the public interest.

The Attorney General attached to the Response materials including an affidavit by Marion C.I. Correctional Assistant Superintendent for Programs David Cothron, who is familiar with Marion C.I.'s RDU and with Plaintiff, (Doc. No. 15-1).

RDU is designed as an alternative for offenders assigned to long-term restrictive housing for control purposes. The goal is to allow an offender who would otherwise be assigned to long-term restrictive housing the opportunity to work toward a custody and control status that is more akin to general population. The Program attempts to accomplish this through phased special programming. An offender's custody and control status gradually improves as he moves through phases of the Program until their status is virtually indistinguishable from general population.

4

Enrollment in the Program is not voluntary; members are selected from a pool of eligible offenders. Offenders who are aggressive or have a history of assaultive infractions are typically selected. Once placed in the Program, an offender stays there until he completes the Program or is moved out of it as a result of no longer meeting one of the eligibility criteria, or some other exigent circumstance.

Members of the Program can be categorized as participating or non-participating; they are considered participating if they are actively engaged in the specialized RDU. Members of the Program who actively refuse to engage in the programming or commit some disciplinary infractions are considered non-participating. A participating member can become a non-participating member as a result of their behavior such as committing a serious infraction or refusing to engage in the Program.

Each week a committee comprised of facility administration, unit management, medical, and mental health staff, meets to evaluate special offender cases including non-participants in the Program. Non-participating members can request to participate at any time. Non-participating members expressing a desire to participate are moved to participating status as soon as possible. Non-participating members are housed in E-unit under conditions that resemble conventional long-term restrictive housing for control purposes whereas participating members are housed in various units throughout the facility, depending on their stage of the Program.

Plaintiff was assigned to restrictive housing for control purposes on October 17, 2017, because of a weapon possession offense. He was selected for RDU on December 28, 2017 and was transferred to Marion C.I. on January 8, 2018. Around February 4, 2018, he began refusing to participate in the Program. As a result of his refusal, he was housed in E-unit on non-participating status from May 3, 2018 through August 22, 2018. For approximately three months, he was moved

to participating status and housed in a participating wing on E-unit. However, on or about November 20, 2018, he again refused to participate and was moved to non-participating status. To date, Plaintiff refuses to participate and remains on non-participating status in E-unit.

Plaintiff's housing conditions on E-unit closely resemble conventional restrictive housing for control purposes. Offenders are provided three meals per day and five hours of recreation per week. These conditions are in accordance with the Department's Policy and Procedures related to long-term restrictive housing for control purposes. Nothing about the manner in which Plaintiff is housed at Marion C.I. supports an inference that he conditions of confinement can support a § 1983 cause of action or injunctive relief. Plaintiff has failed to forecast any evidence suggesting that his housing conditions have resulted in some extreme deprivation and that the Department, through some official, knew of and disregarded an excessive risk to his health or safety, so he cannot satisfy the objective or subjective prongs of a conditions-of-confinement claim and cannot establish a likelihood of success on the merits.

The record indicates that Marion C.I. can monitor and address Plaintiff's mental health status regardless of his housing condition, and Plaintiff offers no allegations or evidence to suggest that staff are incapable of addressing his mental health needs. The record shows that Plaintiff has been refusing many of the services being offered for mental health.

Since arriving at Marion C.I., Plaintiff received a nutritional assessment which determined that the regular non-meat diet with a snack is sufficient to meet his dietary needs. Plaintiff is able to request an additional nutritional assessment through the sick-call process and medical staff can order a nutritional assessment if they deem it necessary. Plaintiff has not presented any evidence suggesting that his incarceration at Marion C.I. or enrollment in the program has any actual effect on his access to adequate nutrition. Plaintiff's own actions may have had a negative effect on his

nutrition and Marion C.I.'s ability to assess his health; Plaintiff has on multiple occasions engaged in a hunger strike and refuses to be weighed.

Even if his housing on E-unit affected his ability to access mental health services or adequate nutrition, Plaintiff was provided an opportunity to participate in the Program at least weekly, which would result in moving him to D-unit as soon as possible, where he would remain unless and until he chooses not to participate in the Program any longer or commits some infraction.

While housed in D-unit and participating in the Program, Plaintiff's conditions of confinement would progressively move toward status that closely resembles general population status. Plaintiff has control over whether and when his housing conditions can improve.

Regardless of where or how Plaintiff is housed, he will be provided adequate nutrition and will have appropriate access to mental health services. He has not pointed to actual evidence suggesting that his access to nutrition and/or mental health services will change with a change in housing condition or facility, so he cannot show irreparable harm and is not entitled to preliminary injunctive relief.

Plaintiff's enrollment in RDU "has not affected Marion Correctional Institution's ability to monitor his mental health, or his access to mental health services." (Doc. No. 15-1 at 6). Cothron has not been informed by mental health staff that Plaintiff's mental health status prevents him from being housed in E-unit under conditions closely resembling long-term restrictive housing for control purposes. If he was so informed, Marion C.I. "would act swiftly to ensure that [Plaintiff's] circumstances were altered such that he could receive the appropriate and necessary level of mental health care." (Doc. No. 15-1 at 5). If mental health and/or medical staff determined that another facility was better able to address Plaintiff's needs, then Marion C.I. would attempt to facilitate a

7

transfer.

Nor can Plaintiff show that the balance of harm weighs in favor of relief or that granting relief is in the public interest. Plaintiff is serving a life sentence for first-degree murder. Since being incarcerated he has 31 infractions. Seven involved a weapon, three involved assaults (two of which were on staff and one of which was on another inmate). One of the purposes of long-term restrictive housing for control purposes is to protect other inmates and correctional staff from assaultive offenders. One of the purposes of RDU is to present an alternative to long-term restrictive housing for control purposes. Plaintiff has demonstrated a history of assaultive and aggressive behavior and was assigned to long-term restrictive housing.

Potential harm in granting Plaintiff's requested relief is that he is released into general population without having completed the programming which was specifically designed to rehabilitate him and thereby decrease the likelihood of further infractions that could send him back to long-term restrictive housing. There is also potential harm to another inmate or staff. Plaintiff has not credibly shown any excessive risk to his health or safety as a result of being housed in Marion's E-unit.

There is public interest in segregating offenders with a tendency toward aggression and assaultive behavior, and in providing these offenders with an opportunity to rehabilitate. It also favors allowing state administrators the latitude to furnish medical treatment in state prisons without excessive interference from the courts.

Cothron is not aware of any circumstances indicating that Plaintiff is no longer eligible for the Program, and accordingly Cothron sees no reason that he should be exited from the Program. While he continues to refuse participation he will continue in E-unit under housing akin to long-term restrictive housing for control purposes.

If Plaintiff had not been selected for RDU, "he would be housed under conditions that are virtually identical to the conditions under which he is currently housed." (Doc. No. 15-1 at 6)

Plaintiff was placed on a "regular with snack non-meat diet" around October 11, 2018 following a nutritional assessment by registered dietician Mickie Herman. (Doc. No. 15-1 at 7). According to Herman, the diet is sufficient to meet Plaintiff's caloric needs. The most recent assessment was conducted in October 2018 and was recommended for 6 months. Then Plaintiff's nutritional needs will be reassessed; he is due for an assessment soon.

Nutritional assessments are performed on a case by case basis, and an offender can request one through sick call. One can also be ordered by a medical professional at any time. An offender's weight and labs are collected and monitored in accordance with the Department's Health Services Policy. The responsible medical professionals are expected to note and act on any significant changes, which can include consulting with a dietician. Plaintiff's enrollment in the Program has not affected Marion C.I.'s ability to administer the medically prescribed diet. Marion can administer any of the diets available within the Department's facilities regardless of an offenders custody or control status, or housing conditions. If it were determined that Plaintiff required a diet modification of any sort, Marion would be able to accommodate that modification.

Plaintiff has refused to be weighed since December 14, 2018 and he has declared two hunger strikes in December 2018 and January 2019, lasting 2 days and 6 days. (Doc. No. 15-1 at 8). "[T]here is no basis to change [Plaintiff's] diet or snack, nor is there a basis to exit him from the Program or transfer him to another correctional facility." (Doc. No. 15-1 at 8)

The Attorney General's Office has filed Plaintiff's NCDPS offender public information report showing Plaintiff's history of infractions. (Doc. No. 15-2 at 1).

The Attorney General's Office has also filed Plaintiff's Case Management Notes from

March 27, 2018 to February 21, 2019, showing Plaintiff's repeated refusals to participate in RDU. (Doc. No. 15-2 at 3-17)

Plaintiff's History of Segregated Inmate Custody Observations show monitoring of Plaintiff's condition and his refusals of medications and meals. (Doc. No. 15-2 at 18-24).

NCDPS Policy & Procedure indicates that "restrictive housing for control purposes will be authorized for any offender found guilty of a major conduct rule violation involving a serious assault, a staff assault resulting in physical injury…." (Doc. No. 15-3 at 1). "If an offender was placed in restrictive housing due to an assault on staff resulting in physical injury, upon the release from Restrictive Housing for Control Purposes, the offender will be placed in the Rehabilitative Diversion Unit (RDU) Program. (Doc. No. 15-3 at 3).

**(4)** **Discussion**

Plaintiff has failed to demonstrate that he is likely to succeed on the merits of his claims challenging the conditions of his confinement at Marion C.I.'s RDU. He has not demonstrated that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, or that an injunction is in the public interest. Therefore, Plaintiff's motion for preliminary injunctive relief will be denied for the reasons set forth in the Attorney General's Response.

**III. SCREENING**

**(1)** **Standard of Review**

Because Plaintiff is a prisoner proceeding in forma pauperis, the Court must review the Complaint to determine whether it is subject to dismissal on the grounds that it is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In its frivolity

review, a court must determine whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327-28 (1989). A complaint should not be dismissed for failure to state a claim "unless 'after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)).

A pro se complaint must be construed liberally. See Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) ("Liberal construction of the pleadings is particularly appropriate where … there is a pro se complaint raising civil rights issues."). However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in his complaint which set forth a claim that is cognizable under federal law. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990). A *pro se* complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); see Ashcroft v. Iqbal, 556 U.S. 662 (2009) (the Twombly plausibility standard applies to all federal civil complaints including those filed under § 1983). This "plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). He must articulate facts that, when accepted as true, demonstrate he has stated a claim entitling him to relief. Id.

**(2)** **Discussion**

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. Bright v. McClure, 865 F.2d 623, 626 (4th Cir. 1989) (citing McConnell v. Adams, 829 F.2d 1319, 1328 (4th Cir. 1987)). Moreover, "neither a state nor its officials acting in their official capacities are 'persons' under § 1983." Will, 491 U.S. at 71.

The Marion C.I.'s Rehabilitative Diversion Unit is not a "person" within the meaning of the State of North Carolina and shares the State's sovereign immunity. See Bennett v. Reed, 534 F.Supp. 83, 85 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982) ("The Department of Corrections of the state of North Carolina is not a 'person' within the meaning of the State of North Carolina and, therefore, shares the state's sovereign immunity."); Fox v. Harwood, 2009 WL 1117890 at *1 (W.D.N.C. April 24, 2009) (neither NCDPS or any of its facilities are "persons" under § 1983).

Therefore, suit against Marion C.I.'s Rehabilitative Diversion Unit, the only Defendant named in this action, is precluded, and Plaintiff has failed assert his claims against any Defendant against whom this claim can proceed. See generally Fed. R. Civ. P. 8(a)(2) (short and plain statement is required); Simpson v. Welch, 900 F.2d 33, 35 (4th Cir. 1990) (conclusory allegations, unsupported by specific allegations of material fact are not sufficient); Dickson v. Microsoft Corp., 309 F.3d 193, 201-02 (4th Cir. 2002) (a pleader must allege facts, directly or indirectly, that support each element of the claim).

The Complaint is therefore insufficient to proceed and will be dismissed without prejudice for failure to state a claim on which relief may be granted and for seeking damages against an

immune entity pursuant to § 1915(e)(2)(B)(ii)-(iii).

## IV. MOTIONS

**(1) Motion to Disqualify**

Plaintiff filed a Motion to Disqualify the North Carolina Attorney General from acting as counsel pursuant to NCDPS Policy & Procedures A.0107(a), (Doc. No. 14), arguing that the State of North Carolina does not have an interest in this case and is not a party and therefore is not authorized to provide legal assistance or advice in this case.

Plaintiff's Motion is lacking in any legal or factual basis and will be denied.

**(2) Motion for Appointment of Counsel**

Plaintiff has filed a Motion to Appoint Counsel, (Doc. No. 16), in which he states cannot afford to hire counsel, his mental illness substantially limits his ability to litigate, and that counsel will aid in the expedient resolution of this case.

There is no absolute right to the appointment of counsel in civil actions such as this one. Therefore, a plaintiff must present "exceptional circumstances" in order to require the Court to seek the assistance of a private attorney for a plaintiff who is unable to afford counsel. Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987).

The record reflects that Plaintiff has been able to adequately represent himself in these proceedings. He has failed to present any exceptional circumstances that would justify appointment of counsel. Therefore, Plaintiff's Motion will be denied.

**(3) Motion for Default Judgment**

In the Motion for Default Judgment, (Doc. No. 17), Plaintiff seeks injunctive relief releasing him from continuous solitary confinement due to malnutrition. He claims that the only justification for continuous solitary is assault on staff resulting in physical injury, which Plaintiff

13

denies. Nurses are not qualified to assess and verify nutritional or dietary needs; this must be done by a registered dietitian or doctor. Plaintiff claims that he has fewer than 24 points, consistent with medium custody classification and Marion C.I. is a close custody institution. Further, Plaintiff receives psychotropic medication which gives him a mental health status of three and Marion C.I. is not authorized to hold people with M3 status. Plaintiff claims that Defendant has not shown good cause to legally hold Plaintiff in solitary and has not produced affidavits or declarations from appropriate staff about Plaintiff's dietary and nutritional needs. He claims that his diagnosis of heightened anxiety has progressed to schizophrenia since the date of the Court's order, which shows irreparable harm. Failure to grant injunctive relief will substantially limit Plaintiff's ability to independently perform major life activities. Plaintiff seeks unconditional immediate release from solitary, a 3,000 calorie per day diet with protein snack, and transfer to Warren C.I. which is a medium custody level facility.

Plaintiff attached to his Motion a Memorandum to Incarcerated Offender Population from Kenneth Lassiter re "Sanctions stemming from Assaults on Staff resulting in Physical Injury," (Doc. No. 17 at 4), that addresses greater consequences for infractions to ensure staff safety and security. Plaintiff also attached to his Motion a medication summary indicating that he has been prescribed psychotropic medication. (Doc. No. 17 at 5).

Plaintiff's request for default judgment is meritless insofar as the Attorney General filed a Response in opposition to his Motion for Preliminary Injunction. See (Doc. No. 15). To the extent that Plaintiff is renewing his request for preliminary injunctive relief, that request fails for the reasons set forth in the Attorney General's Response. See (Id.). Plaintiff's Motion for Default Judgment will therefore be denied.

**(4)** **Motion for Appropriate Relief**

In his Motion for Appropriate Relief, (Doc. No. 18), Plaintiff seeks relief from mental anguish and weight loss due to continuous solitary confinement. He alleges that RDU is not a component of NDCPS Division of Prisons and that it has its own "policy" and property allowances and guidelines. Plaintiff argues that RDU "is currently employing duress for the purpose of coercing the Plaintiff into participating in the RDU." (Doc. No. 18 at 1). Plaintiff claims that his mental and physical health have been deteriorating since being held in continuous solitary confinement and that RDU is aware of Plaintiff's abnormal weight loss and mental illness. RDU's overarching goal and organization do not meet the criterial of facility designation as defined by NCDPS; it is an independent entity with its own directors and policy, its authority is not clothed in statutory or common law, and it is an "unauthorized penal institution." (Doc. No. 18 at 2). RDU's use of duress to coerce Plaintiff into participating coupled with the knowledge that the duress is causing Plaintiff physical injury and mental illness is torture. Plaintiff asks the Court to order an officer of the court to "Replvy Plaintiff from the Custody of [RDU], unconditional release from the facility "on Plaintiff's own recognizance" and $999.99. (Doc. No. 18 at 3).

Plaintiff appears to reiterate his request for preliminary injunctive relief. However, that request fails for the reasons set forth in the Attorney General's Response, (Doc. No. 15), and the Motion will therefore be denied.

**(5)** **Motion for No-Response Default Judgment**

In his Motion for No-Response Default Judgment, (Doc. No. 19), Plaintiff alleges that Defendants failed to timely respond to Motion for Appropriate Relief. He argues that Defendants did not timely respond to Plaintiff's factual allegations that he is being held in RDU under duress and that RDU is an unauthorized penal institution operating unlawfully, which admitted these allegations. Plaintiff claims that he is being falsely imprisoned, wants to be "replevied" from RDU,

unconditionally released on his own recognizance and $999.99. (Doc. No. 19 at 2).

Plaintiff's Motion for Default is meritless insofar as no Defendant has been served and the Court did not order the Attorney General's Office to respond. Moreover, Plaintiff's Motion for Preliminary Injunction fails for the reasons set forth in the Attorney General's Response. See (Doc. No. 15). Therefore, the Motion will be denied.

**V.     CONCLUSION**

The Compliant is dismissed without prejudice pursuant to § 1915(e)(2)(B)(ii)-(iii). The Motion for Preliminary Injunctive and all Plaintiff's other pending Motions are denied.

**IT IS, THEREFORE, ORDERED that:**

1. The Complaint, (Doc. No. 1), is dismissed without prejudice for failure to state a claim upon which relief can be granted and for seeking damages against an immune entity pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii)-(iii).

2. Plaintiff's Emergency Motion for Injunctive Relief, (Doc. No. 10), Motion to Disqualify the North Carolina Office of the Attorney General, (Doc. No. 14), Motion to Appoint Counsel, (Doc. No. 16), Motion for Default Judgment, (Doc. No. 17), Motion for Appropriate Relief, (Doc. No. 18), and Motion for No-Response Default Judgment, (Doc. No. 19), are **DENIED**.

3. The Clerk of Court is instructed to close this case.

Signed: April 23, 2019

Frank D. Whitney
Chief United States District Judge